

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rudy Lozano | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3133 | **DATE** | 8/14/2001 |
| **CASE TITLE** | Sheila Rodriguez vs. Motorola,Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Defendant's motion for summary judgment (34-1) is granted in part and denied moot in part. Plaintiff's Title Vii claims for sex discrimination; national origin discrimination, and retaliation (Counts I and II) are dismissed with prejudice. Plaintiff's claim for intentional infliction of emotional distress (Count III) is dismissed without prejudice. Any other pending motions are moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | AUG 22 2001 | | 52 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | *EB* | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 8/20/2001 | | |
| | | | ED-T FILED FOR DOCKETING | date mailed notice | |
| GL | courtroom deputy's initials | 01 AUG 21 PH 5: 47 | GL | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | | |
|---|---|---|
| SHEILA RODRIGUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 00 C 3133 |
| | ) | |
| MOTOROLA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This matter is before the Court on the Defendant's Motion for Summary Judgment, filed on June 15, 2001. For the reasons set forth below, the motion is **GRANTED IN PART** and deemed **MOOT IN PART**. Plaintiff's Title VII claims for sex discrimination, national origin discrimination, and retaliation (Counts I and II) are **DISMISSED WITH PREJUDICE**. Plaintiff's claim for intentional infliction of emotional distress (Count III) is **DISMISSED WITHOUT PREJUDICE**.

BACKGROUND

Plaintiff, Sheila Rodriguez, alleges that Defendant, Motorola, Inc., discriminated against her on the basis of sex and national origin, because Defendant terminated her and not other employees allegedly engaged in similar misconduct. Plaintiff also alleges that

52

her termination was in retaliation for filing an internal sex discrimination complaint.

The following facts are largely undisputed; however, to the extent there are disputed facts, they have been noted.

In September 1995, Plaintiff began her employment with Defendant as a quality supervisor in the energy systems group ("ESG") of Defendant's Vernon Hills, Illinois manufacturing plant. At the Vernon Hills facility, Plaintiff worked on the second shift. Second shift employees received premium pay in addition to their salary because they worked the evening shift.

In February 1998, Plaintiff was promoted to senior production supervisor and remained on the second shift. At the same time, John Satterlee ("Satterlee") became Plaintiff's supervisor. As part of Plaintiff's duties as senior production supervisor, she was to review and approve, for payroll purposes, the time records for herself and the production supervisors who reported directly to her. Plaintiff was also responsible for addressing any issues related to the employees on her shift and for following up to ensure that issues were resolved.

In the fall of 1998, Defendant closed its Vernon Hills plant and transferred the ESG group to its Harvard, Illinois facility. Under Defendant's usual practice, when an employee transferred, the employee's supervisor was required to submit a personnel action form ("PAF") to human resources ("HR") to reflect the employee's altered

status. The mass transfers to Harvard, however, were not accomplished by individual PAFs. Instead, a spreadsheet containing data for all the ESG employees being transferred was submitted to HR.[1] At the Harvard facility there were only "A" and "B" shifts with each shift working the same hours on different days of the week. Neither A nor B shift employees were supposed to receive premium pay.

In November or December 1998, Plaintiff transferred to the Harvard facility as senior production supervisor on the B shift. Three supervisors reported directly to Plaintiff — Robert Schmitt ("Schmitt"), Tony Aguirre ("Aguirre"), and Greg Dobek ("Dobek"). Plaintiff continued to report to Satterlee and performed the same duties she had in Vernon Hills. In addition, Plaintiff reviewed and approved time records not only for herself, but also for the A shift senior production supervisor and the A and B shift production supervisors.

Although no one was supposed to receive second shift premium pay at the Harvard facility, Plaintiff and several ESG production supervisors continued to receive such pay. Plaintiff noticed in her first few paychecks after the transfer that she was continuing to

_____

[1]The Court notes that Plaintiff at one point says she has no opinion whether spreadsheets were used for the transfer to Harvard and that she did submit PAFs for the supervisors under her authority who transferred. At another point, Plaintiff agrees that spreadsheets were used and that transfers were not accomplished by PAFs. Genuine issues of material fact cannot be created by a party merely contradicting itself. Ultimately, this potentially disputed fact has no effect on the Court's decision.

receive premium pay. The parties apparently disagree whether Plaintiff notified Satterlee that she received such pay. Again, Plaintiff is inconsistent with her assertions. At one point, Plaintiff agrees with Defendant that she failed to notify anyone and then also claimed she notified Satterlee.

In January and February 1999, Schmitt notified Plaintiff that he was improperly being paid shift premium. Schmitt presented Plaintiff with a paystub indicating such pay. Plaintiff did not inspect her own paychecks after being informed of Schmitt's improper pay. The parties dispute whether Plaintiff properly reported the error in Schmitt's paycheck to Satterlee.

On March 17, 1999, John Milligan ("Milligan"), an employee at the Harvard facility, notified Vicki Steffy ("Steffy") of Defendant's HR department that Plaintiff told him that Plaintiff had been receiving premium pay since her transfer and that she was not going to report it.[2] Steffy initiated an investigation and verified that Plaintiff, along with Aguirre, Schmitt, Eric Nilsson ("Nilsson"), Joe Wiorek ("Wiorek"), and Peter Stankovich ("Stankovich") were improperly receiving premium pay. Aguirre and Schmitt were B shift production supervisors directly reporting to Plaintiff. Nilsson and Wiorek were A shift production supervisors and Stankovich was an A shift quality

_____

[2]Plaintiff apparently disagrees that March 17, 1999, is the date Defendant began its investigation, although Plaintiff alternately agrees and disagrees this is the date.

supervisor. Plaintiff approved the time entered for all those individuals, with the exception of Stankovich, for some pay periods since the transfer to Harvard. Plaintiff contends she did not approve their time for every pay period because she was not present on every pay period. Plaintiff contends Satterlee had to approve the time for those individuals on some occasions. Steffy asked Satterlee if he was aware of anyone improperly receiving premium pay. Satterlee stated he was not.

Around the same time, after an incident in which Satterlee yelled at Plaintiff and her team for shutting the line down five minutes early, Plaintiff met with Steffy to complain about Satterlee. Plaintiff asserts this was a complaint regarding sex discrimination.

Steffy and other HR managers interviewed every individual who received shift premium. In Plaintiff's interview, she acknowledged that Schmitt told her he was receiving premium pay. Plaintiff claims she informed Satterlee who told her to speak with the payroll clerk, Mauricio Santamaria ("Santamaria"). The parties agree that Plaintiff acknowledged she initially knew she was receiving the pay at some point in the interview. The parties' dispute, however, whether Plaintiff ever denied she was aware she was receiving premium pay at any point in the interview. Further, the parties disagree whether Plaintiff asserted in her interview that she informed Satterlee of her improper pay or that she claimed she said nothing regarding such pay because she thought it would be corrected. Plaintiff also asserted

-5-

she completed a PAF for her supervisors who transferred. No such PAFs could be located in HR files.

After Plaintiff's interview, Steffy again questioned Satterlee and he denied that Plaintiff informed him of improper premium payments. In Aguirre's interview, he denied being aware of receiving premium pay. Similarly, Wiorek denied being aware of receiving premium pay. Wiorek explained that he had direct deposit and only verified the amount of the check with the deposit amount without looking at the paystub.

During Nilsson's interview, Nilsson admitted he knew he was receiving premium pay, but stated he did not tell anyone because he thought the problem would be corrected. Stankovich admitted he was aware of the pay and also stated that Aguirre told him that Aguirre and Plaintiff were receiving premium pay and were not going to report it. Stankovich further contended that Aguirre said Plaintiff was planning to say she had forgotten about it or did not know if asked about the premium pay.

Steffy interviewed Marius Chiracescu ("Chiracescu"), Plaintiff's counterpart on the A shift. Chiracescu informed Steffy that he had only recently learned from Dobek about a conversation Dobek had with Aguirre in which Aguirre allegedly stated that "they were all receiving second shift premium" and that Plaintiff was aware of it. Steffy's interview of Dobek confirmed Chiracescu's statement.

Steffy interviewed Santamaria who stated that Plaintiff only told

-6-

him to make corrections in the payroll system for some of the non-supervisory production employees but never for the supervisors.

At the investigation's conclusion, Steffy, Geoff Grant, an HR manager, and Thomas Fordonski, director of HR at Harvard, determined the fate of each employee. In making their decision, they considered business needs and the relative culpability of each employee. Steffy, Grant, and Fordonski decided that Plaintiff should be terminated because she was the most culpable employee as they believed she both knowingly took unearned premium pay and approved such pay for others. They also believed that Plaintiff's version of events was not as credible as the version recounted by Milligan, Chiracescu, Stankovich, Dobek, Satterlee, and Santamaria. Steffy informed Plaintiff of her termination on or about April 21, 1999.

For their misconduct, Stankovich, Aguirre, and Nilsson were each given a Class III final written warning and placed on a 3-year probation, during which time they were not eligible for pay increases, transfers, or promotions. Further, each was required to pay back the shift premium payments they received. Their punishment was based on the fact they either admitted being aware of the premium payments or the investigation indicated they were aware of such payments.

Wiorek received a Class II final written warning and was placed on a 1-year probation with the same restrictions as Stankovich's, Aguirre's, and Nilsson's probation. He was also required to pay back the premium payments. Wiorek's punishment was based on the fact he

-7-

denied any knowledge of the payments and the investigation did not reveal any evidence to the contrary.

Schmitt was required to pay back premium payments, but received no other discipline because he took appropriate action by reporting the error to Plaintiff. No one else received discipline because there was no evidence that anyone else was receiving or knowingly approving such pay for others.

After filing a charge of discrimination and retaliation with the Equal Employment Opportunity Commission, Plaintiff filed her complaint in the United States District Court for the Northern District of Illinois, alleging that Defendant violated Title VII by terminating her employment on the basis of her sex and her national origin and by retaliating against her for filing an internal complaint of sex discrimination. Plaintiff also alleged a claim of intentional infliction of emotional distress.

In the instant motion, Defendant seeks summary judgment as to each of Plaintiff's claims.

DISCUSSION

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v.*

*Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

-9-

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "`no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## Title VII - Sex Discrimination Claim

Title VII makes it an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).

A plaintiff may establish a sex discrimination claim under Title VII by presenting either direct or circumstantial evidence of sex discrimination or by prevailing in the *McDonnell Douglas* burden-

shifting test. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616-17 (7th Cir. 2000); *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999). Plaintiff chooses to proceed under the *McDonnell Douglas* burden-shifting approach. To succeed under the burden-shifting analysis, Plaintiff must first establish a prima facie case of discrimination by showing that: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated persons not in the protected class more favorably. *Simpson*, 196 F.3d at 876. If Plaintiff establishes a prima facie case, a rebuttable presumption of discrimination is created and the burden of production shifts to Defendant to present evidence of a legitimate, nondiscriminatory reason for the adverse employment decision. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 919 (7th Cir. 2001). Evidence of a non-discriminatory reason for the termination will then shift the burden back to Plaintiff to present evidence that Defendant's proffered reason was pretextual. *Id.*

Defendant contends Plaintiff cannot establish a prima facie case because she fails to demonstrate that there were similarly situated males who Defendant treated more favorably. In determining whether employees are similarly situated, a court must look at all the relevant factors. *Radue*, 219 F.3d at 617. In cases such as this one, where Plaintiff claims she was more severely disciplined than a

similarly situated employee, Plaintiff must show she is similarly situated with respect to performance, qualifications, and conduct. *Id.* These factors can also be broken down into a showing that the employees dealt with the same supervisor, were subject to the same standards, and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18. Plaintiff need not show complete identity in comparing herself to the better treated employees, but she must show substantial similarity. *Id.* at 618; *see also Spath v. Hayes Wheels Int'l-Ind., Inc.,* 211 F.3d 392, 397 (7th Cir. 2000) ("plaintiff must show that the 'comparables' are similarly situated *in all respects*") (internal quotation omitted).

Here, Defendant contends that Plaintiff is not similarly situated to Stankovich, Nilsson, Aguirre, Wiorek, or Schmitt — the five other employees who improperly received shift premium payments — because Plaintiff was a senior supervisor. Defendant further asserts that Plaintiff, unlike the other five employees, approved premium pay for others and was held to a higher expectation of trust, honesty, loyalty, and integrity pursuant to Defendant's policy.

In contrast, Plaintiff asserts that she was a supervisor like the five other employees and only had slightly different duties. Plaintiff also contends they all answered to the same supervisor, Satterlee, and that Defendant's policy does not distinguish among employees in terms of duties regarding honesty and integrity.

-12-

Plaintiff further alleges that Defendant's assertion that she was fired for both receiving and approving premium pay is not supported by the record.

As an initial matter, this Court must note that Plaintiff's claim that the record does not support the fact that she was fired for both receiving and approving pay is somewhat odd given that Plaintiff agreed with the portion of Defendant's statement of facts concerning this point. Further, most of the portion of Steffy's deposition transcript that Plaintiff cites to support her claim is not in the record. The portion actually in the record clearly shows that Plaintiff's alleged approval of premium pay for others was part of the reason for Plaintiff's termination. Plaintiff's argument to the contrary is meritless.

Defendant's code of business conduct does have a section setting out additional responsibilities for "managers," yet it is unclear whether the other five supervisors were considered managers as well.

What is clear is that Plaintiff breezes by the fact that the other five supervisors were *lower-level* supervisors while she was a senior supervisor. While they all may have ultimately answered to Satterlee, Plaintiff was senior to the other five with two of them, Schmitt and Aguirre, reporting directly to her. Supervisors and superiors are not similarly situated to subordinates. *See Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1042 (7th Cir. 1993) (manager not similarly situated to subordinate employee); *Jackson v. Northwestern*

-13-

*Ill. Univ.,* No. 99 C 6740, 2000 WL 1853331, at *3 (N.D. Ill. Dec. 18, 2000) (plaintiff who cited punishment that supervisors and superiors received failed to establish similarly situated employee treated more favorably). Plaintiff, as a senior supervisor, could not be similarly situated to the other five employees who received premium pay especially where only she had the duty of approving payroll. *See Ulreich v. Ameritech Cellular Communications,* No. 99-1820, 2000 WL 10280, at *3 (7th Cir. Jan. 4, 2000) (subordinate who alone monitored reseller credit request was not similarly situated to her superiors). To be similarly situated, Plaintiff and the other five employees must have engaged in comparable conduct both in type and seriousness. *See Logan,* 246 F.3d at 920 (employee guilty of one of the same violations as plaintiff does not render employee similarly situated); *Radue,* 219 F.3d at 617-18 (similarly situated if engaged in similar conduct without such differentiating circumstances as would distinguish their conduct); *Spath,* 211 F.3d at 397 (conduct not of "comparable seriousness" where one employee rescinded false statement and plaintiff pursued in his false statement and also filed a false report); *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 349 n.3 (7th Cir. 1997) (not similarly situated where employees do not engage in same misconduct as plaintiff). Unlike the other five employees, only Plaintiff approved premium pay for others. Accordingly, to the extent Plaintiff relies upon Stankovich, Nilsson, Aguirre, Schmitt, and Wiorek as similarly situated, her argument fails.

Similarly, Plaintiff's contention that she is similarly situated to senior supervisors Chiracescu, Satterlee, and Scott Soukup ("Soukup") also fails. Soukup was a quality manager who approved Stankovich's time entries. There is no dispute that neither Chiracescu, Satterlee, or Soukup received premium pay. There is also no dispute that the HR investigation did not indicate that Soukup or Chiracescu knew that a subordinate was improperly receiving shift premium pay. Only Plaintiff's self-serving statements indicated that Satterlee knew that she and Schmitt were receiving premium pay. As Defendant points out, there is also no evidence, other than Plaintiff's self-serving statements, that Chiracescu or Satterlee even approved any improper payments. Whether or not Chiracescu, Satterlee, or Soukup approved premium pay for others, it is clear none of them received such payments themselves, and, therefore, they are not similarly situated to the Plaintiff. *See Logan,* 246 F.3d at 920; *Radue,* 219 F.3d at 617-18; *Spath*, 211 F.3d at 397; *Plair,* 105 F.3d at 349 n.3.

Since Plaintiff has failed to present sufficient evidence to raise a question of fact regarding whether Defendant treated similarly situated male employees more favorably, she has failed to sustain the initial burden of establishing a prima facie case of sex discrimination.

<u>Title VII - National Origin Discrimination Claim</u>

Plaintiff also proceeds under the *McDonnell Douglas* burden-shifting analysis for her national origin discrimination claim. Plaintiff is basing her national origin claim on the fact that HR, more particularly, Steffy, allegedly believed all the non-Hispanic employees interviewed in the investigation and did not believe her or Aguirre, also of Hispanic origin. As discussed more fully in this Court's analysis of Plaintiff's sex discrimination claim, none of the individuals Plaintiff points to are similarly situated to her. Since Plaintiff has failed to present sufficient evidence to raise a question of fact regarding whether Defendant treated similarly situated non-Hispanic employees more favorably, she has failed to sustain the initial burden of establishing a prima facie case of national origin discrimination.

Although Plaintiff's failure to establish a prima facie case justifies dismissal of her sex and national origin discrimination claims, *see Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 453 n.4 (7th Cir. 1998), this Court will nonetheless address the remainder of the *McDonnell Douglas* burden-shifting analysis.


<u>Pretext</u>

If Plaintiff had sustained her burden of establishing a prima facie case of sex or national origin discrimination, the burden would shift to Defendant to articulate a legitimate, nondiscriminatory

-16-

reason for its decision to discharge Plaintiff. It is undisputed that Defendant has done so. The burden then shifts back to Plaintiff to show that Defendant's proffered reason is a pretext for discrimination. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999). Pretext in this context means a lie. *Id.; see also Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000); *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000). Plaintiff may establish pretext directly by showing that the employer "was more likely than not motivated by a discriminatory reason, or indirectly by presenting evidence that the employer's explanation is not credible." *Logan*, 246 F.3d at 920 (internal quotation omitted). With the indirect method, Plaintiff must present evidence that: (1) Defendant's explanation for her termination had no basis in fact; (2) the explanation was not the real reason for her termination; or (3) the reason given was insufficient to warrant the adverse job action. *Id.* Whether direct or indirect, Plaintiff must provide some evidence that the employer did not "honestly believe the reasons given for [her] discharge." *Id.* at 921; *see also Plair*, 105 F.3d at 349 (court looks to determine if factual dispute exists as to whether reasons are honest and genuinely motivated). To successfully challenge the honesty of Defendant's reasons, she must "specifically" rebut those reasons. *Green v. National Steel Corp.*, 197 F.3d 894, 898 (7th Cir. 1999).

According to Plaintiff, pretext is demonstrated by the fact that

the other premium pay-receiving employees were not discharged and via allegations concerning Steffy. Specifically, Plaintiff contends that Defendant's investigation revealed that Nilsson, Stankovich, and Aguirre each knew they were receiving premium pay and decided to continue the theft, yet none of them were discharged.

The Court finds it somewhat odd that Plaintiff is even arguing Defendant's reasons were pretextual given that she agreed with the portion of Defendant's statements of facts in which it stated that Fordonski, Grant, and Steffy decided Plaintiff was the most culpable because she was a senior supervisor, held to a higher standard of responsibility, and was the only employee who both knowingly received shift premium pay and approved the payment for others. Given Plaintiff's admission that this is what the HR personnel decided, it is difficult to say they did not honestly believe the reason. Also, Plaintiff does not dispute the fact that several employees accused her of both receiving and approving premium pay. Plaintiff also does not deny that theft warrants termination.

Further, as discussed previously, neither Nilsson, Stankovich, or Aguirre were similarly situated to Plaintiff. Out of this group of employees, Plaintiff was the only senior supervisor, the only one with the duty of approving payroll, and the only one who actually approved premium pay for others. Any difference in treatment for nonsimilarly situated employees cannot demonstrate pretext. *See Sweis v. Hyatt Corp.*, No. 98 C 7770, 2001 WL 619509, at *6 (N.D. Ill. May

25, 2001) (plaintiff did not establish pretext where plaintiff failed to point to similarly situated employee treated differently). Also, the fact that Aguirre was not terminated and received the same punishment as Nilsson and Stankovich, both white males, undercuts any argument that Defendant's reason for terminating Plaintiff was pretext for national origin discrimination. Further, Plaintiff does not even address the undisputed fact that Defendant's decision to terminate Plaintiff and not the lower-level supervisors was also based, in part, on business needs.

Plaintiff's focus on Steffy, one of three people involved in the decision to terminate her, also fails to establish pretext. Plaintiff contends that discriminatory animus is apparent from the fact that Steffy believed only the white male employees interviewed and the fact that the two Hispanic employees received harsh discipline. Again, the Court notes that Plaintiff is not similarly situated to any of the white male employees interviewed so this cannot establish pretext. *See Sweis,* 2001 WL 619509, at *6. Also, Plaintiff completely ignores the undisputed fact that the investigation only revealed contradictory evidence regarding Aguirre's and Plaintiff's version of events. Only Plaintiff's (and possibly Aguirre's) self-serving statements contradicted Stankovich, Dobek, Milligan, Satterlee, Santamaria, and Chiracescu. It is undisputed that Milligan, Stankovich, Dobek, and Chiracescu independently corroborated the allegation that Plaintiff knew about the improper premium pay. Stankovich, Dobek, and

Chiracescu also corroborated the allegation that Aguirre knew about such payments. Nor is it undisputed that Steffy believed Santamaria, a Hispanic male. It is also undisputed that no evidence contradicted Wiorek's claim that he did not know about the premium pay. Plaintiff herself corroborated Schmitt's statement that he knew he was receiving premium pay and properly alerted Plaintiff. Again, it is undisputed that Aguirre received the same discipline as white males Stankovich and Nilsson. Nothing in the record indicates that Steffy's decision regarding credibility was more likely than not motivated by a discriminatory reason. There is also nothing in the record to suggest that HR's conclusion regarding the various employee's credibility and culpability had no basis in fact or was not the real reason for Plaintiff's termination. Plaintiff has not provided any evidence to suggest that Steffy did not honestly believe that the evidence of her and Aguirre's misconduct was more credible than their denials.

Plaintiff also contends that discriminatory animus is apparent from the fact that Steffy heard defaming comments about Plaintiff and a reference to her race, yet did not report it or investigate it. In one case, Steffy heard a group of African-American employees make comments about Plaintiff giving preferential treatment to other Hispanic employees after a sensitivity training class. Steffy testified that she told the employees that these type of discussions were not appropriate and were what they had just been discussing in training. She also told the employees she did not anticipate that she

would be hearing it again. Plaintiff does not dispute that Steffy made these comments.

In the other case, Milligan allegedly told Steffy he was afraid of what Plaintiff or others in the Hispanic community at the Harvard facility would do if they found out Milligan had been the one to come forward. The Court must note that Plaintiff egregiously misrepresents the cited portion of Steffy's deposition testimony. Plaintiff represents that many employees were afraid of Plaintiff and were afraid to come forward because Plaintiff or her "Hispanic henchmen" would physically harm them. In contrast, Steffy's deposition testimony was that Milligan said he was afraid of what might happen if Plaintiff or the Hispanic community discovered he came forward. Steffy did not say Milligan was afraid of physical harm. Plaintiff's counsel assumed physical harm in a question to Steffy and Steffy clarified that she did not know what Milligan meant by the term "afraid." At the very least, it does not seem to be a reasonable inference to say that Milligan represented many employees.

As Defendant points out, it is unclear how failing to investigate claims against Plaintiff shows discriminatory animus towards her. If anything, Steffy's alleged failure to investigate complaints against Plaintiff would suggest preferential treatment. With regard to Steffy's alleged failure to discipline the African-American employees who discussed Plaintiff after the sensitivity training class, it is unclear how Steffy's undisputed verbal reprimand was unreasonable in

-21-

the situation.

Moreover, Plaintiff alludes to the fact that Steffy terminated Plaintiff and replaced Plaintiff with Steffy's own friend/housemate. It is undisputed that Defendant replaced Plaintiff with Michelle Maltes ("Maltes"), a Hispanic female production supervisor from another one of Defendant's facilities. It is further undisputed that Steffy recommended Maltes and that Maltes was her friend and housemate. It is also undisputed that Satterlee and plant manager Mark Spier hired Maltes. As Defendant notes, the fact that Plaintiff's replacement was a Hispanic female at least raises an inference that her sex or national origin were not the reason Defendant discharged Plaintiff. *See Burton v. Southwestern Bell Mobile Sys.*, 74 F. Supp. 2d 841, 848 n.11 (C.D. Ill. 1999) (a plaintiff replaced with employee of same race raises inference race not reason for plaintiff's termination); *Williams v. Cuomo*, 961 F. Supp. 1241, 1246-47 (N.D. Ill. 1997) (same).

Viewing the facts in the light most favorable to Plaintiff, she has not raised a question of fact regarding whether Defendant's proffered reason is a pretext for sex or national origin discrimination. Plaintiff simply has not established that Defendant did not honestly believe the reasons given for her discharge or specifically rebut Defendant's reasons. Defendant's reasoning may not have been fair or correct, however, as long as it is the true reason then there is no pretext. *Logan*, 246 F.3d at 921. As the Seventh

Circuit has often repeated, courts do not sit as superpersonnel departments to review employer's business decisions. *Ransom,* 217 F.3d at 471; *Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1035 (7th Cir. 1999). Absent some evidence Defendant did not honestly believe its articulated reason for terminating Plaintiff, this Court cannot find pretext merely because Defendant may have been unfair or even wrong. Accordingly, to the extent Defendant's motion for summary judgment concerns Plaintiff's sex and national origin discrimination claims, the motion is **GRANTED** and Plaintiff's sex and national origin discrimination claims (Count I) are **DISMISSED WITH PREJUDICE.**


Title VII - Retaliation Claim

Title VII also makes it unlawful for an employer to discriminate against any of its employees because the employee has complained about the type of discrimination Title VII prohibits. 42 U.S.C. § 2000e-3(a). Plaintiff alleges that Defendant violated Title VII by firing her in retaliation for complaining about sex discrimination. Plaintiff proceeds under the *McDonnell Douglas* burden-shifting approach. To establish a prima facie case of retaliation, Plaintiff must show that: (1) she engaged in statutorily protected expression by complaining about discrimination that Title VII covers; (2) she suffered an adverse action by her employers; and (3) there is a causal link between the protected expression and the adverse action. *Miller v. American Family Mut. Ins. Co.,* 203 F.3d 997, 1007 (7th Cir. 2000).

The parties disagree as to whether Plaintiff satisfied her burden of establishing a prima facie case. Even assuming Plaintiff established a prima facie case, her claim fails because she cannot demonstrate pretext. Plaintiff concedes that the pretext analysis for her retaliation claim is the same as for her discrimination claims. As Plaintiff did not raise a question of fact regarding pretext under her discrimination claims, her retaliation pretext analysis similarly fails. *See Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1147 (7th Cir. 1997) (where plaintiff failed to show pretext in pregnancy discrimination claim, court noted plaintiff's retaliation claim would similarly fail under pretext analysis). Accordingly, to the extent Defendant's motion for summary judgment concerns Plaintiff's retaliation claim, the motion is **GRANTED**. Plaintiff's retaliation claim (Count II) is **DISMISSED WITH PREJUDICE**.

The Court is compelled to note that in Plaintiff's response to Defendant's statement of material facts, Plaintiff states that an investigation into a complaint against Milligan was dropped in light of his revelation of Plaintiff's alleged misconduct. The statement can only be to imply some bad motive on the part of Defendant, however, Plaintiff's statement is an egregious mischaracterization of the record. From this Court's review of the cited portions of Steffy's deposition testimony, Milligan was initially interviewed by HR because John Collins ("Collins"), Milligan's supervisor, complained that Plaintiff allegedly asked Milligan for the pay sheet for one of

Collins' employees. It appears the complaint was actually about Plaintiff and not Milligan. It should go without saying that such misrepresentations are inappropriate. If not a misrepresentation, then Plaintiff should cite the appropriate portions of the record sufficient to support her statements.

## Intentional Infliction of Emotional Distress Claim

Under 28 U.S.C. section 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over a claim where it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). As this Court has dismissed all of Plaintiff's Title VII claims, the only remaining claim is Plaintiff's state law claim of intentional infliction of emotional distress. Pursuant to 28 U.S.C. § 1367(c)(3), this Court declines to exercise supplemental jurisdiction over Plaintiff' state law claim and it is **DISMISSED WITHOUT PREJUDICE**. To the extent Defendant's motion for summary judgment concerns the intentional infliction of emotional distress claim, it is **MOOT**.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and deemed **MOOT IN PART**. Plaintiff's Title VII claims for sex discrimination, national origin discrimination, and retaliation (Counts I and II) are **DISMISSED WITH**

**PREJUDICE.** Plaintiff's claim for intentional infliction of emotional distress (Count III) is **DISMISSED WITHOUT PREJUDICE.**

ENTER: 8/14/2001

RUDY LOZANO, Judge
**U.S. District Court**